**UNITED STATES of America, Appellee,**

v.

**Steven C. WILLIS, Appellant.**

**No. 92–2765.**

United States Court of Appeals,
Eighth Circuit.

Submitted Feb. 15, 1993.

Decided July 1, 1993.

---

David R. Gienapp, Madison, SD, argued, for appellant.

Kevin V. Schieffer, Sioux Falls, SD, argued, for appellee.

Before BOWMAN, WOLLMAN, and HANSEN, Circuit Judges.

WOLLMAN, Circuit Judge.

Steven C. Willis appeals from his conviction on seven counts of defrauding a federally insured savings bank, in violation of 18 U.S.C. § 1344 and § 2, one count of conspiring to defraud a federally insured savings bank, in violation of 18 U.S.C. § 371, and one count of bribing an officer of a financial institution, in violation of 18 U.S.C. § 215. Willis raises several arguments that the district court[1] committed reversible error during and after his trial, including denying his motion for a new trial, allowing the introduction of his coconspirators' guilty pleas, and imposing his sentence. We affirm.

## I.

Willis graduated from law school in 1976, receiving a Masters in Business Administration degree at the same time. After working for two years as a certified public accountant with an accounting firm in Sioux Falls, South Dakota, Willis opened a law office in 1978. Over the next several years he specialized in setting up limited partnerships for various real estate projects, often acting as one of the project's general partners.

According to the evidence at trial, Willis sometimes directed potential investors in his limited partnerships to Steve Ettles. At the time, Ettles, a longtime friend and fraternity brother of Willis, was the manager of the Sioux Falls branch of First Federal Savings Bank ("First Federal"), headquartered in Rapid City, South Dakota. The evidence showed that during this time period Willis sent numerous checks to Ettles in various names, including S.E. Consulting. Willis testified that these checks constituted payments for consulting services rendered by Ettles. To the contrary, Ettles testified that there was no business named S.E. Consulting, that he had performed no consulting duties, and that the payments were kickbacks for loans he had made through First Federal.

In November 1982, Willis approached Charles Hopp about buying Davis Tailors, a dry cleaning business in Sioux Falls. Having concluded that Davis Tailors presented a good investment opportunity, Willis and Hopp entered into a 50/50 partnership to purchase and manage the business. Willis ultimately took over the management of the business, conducting all of Davis Tailors' financial affairs.

---

1. The Honorable Richard H. Battey, United States District Judge for the District of South Dakota.

In early 1985, Willis, Hopp, and Ettles formed a partnership named RecCo to purchase the Recreation Bowl ("Rec Bowl"), a bowling alley and lounge in Sioux Falls. According to the partners' agreement, Ettles and Willis each had forty percent interests and Hopp had a twenty percent interest. RecCo bought the Rec Bowl on a contract for deed for a total purchase price of $625,000. The purchase agreement called for an immediate down payment of $50,000, a second $50,000 payment within the first year, and the remainder to be amortized through monthly payments.

All three partners needed to finance their contributions to the partnership, including the initial $50,000 down payment. Ettles made loans of $24,000 and $12,000 to Willis and Hopp respectively, although both men were now Ettles's business affiliates and therefore should not have been receiving loans through him. Because Ettles did not want anyone at First Federal to know of his involvement in RecCo, he did not tell his superiors about the loans, in violation of bank policy and federal regulations. Ettles obtained his financing through another Sioux Falls bank.

Hopp, who had some experience in the food and liquor business, managed the bowling alley and the lounge on a day-to-day basis. Willis controlled the business's financial matters. Despite the partners' ambitions, the Rec Bowl quickly developed financial difficulties. The three partners met periodically at the bowling alley to discuss solutions to their cash flow problems. Willis and Hopp obtained additional loans through Ettles at First Federal until January 1987, when Ettles's superiors, still ignorant of Ettles's involvement in RecCo, told Ettles to stop extending credit to Willis and Hopp. By that time, RecCo had also obtained a $25,000 loan from Norwest Bank to help meet the Rec Bowl's operating expenses.

According to the trial testimony of Hopp and Ettles, at one of the partners' meetings,

Ettles told his partners that they could borrow no more money from First Federal. Faced with a steady stream of bills at both the Rec Bowl and Davis Tailors, the partners decided to seek out individuals to borrow money on their behalf. From August 1987 to December 1989, each of the partners solicited friends and employees to obtain loans from First Federal through Ettles and then deliver the proceeds to the partnerships. The partners succeeded in persuading seven individuals to take out loans in their own names totalling more than $77,000.[2]

Typically, events tracked the following course. When the partners determined that they needed additional funds to meet a large upcoming payment such a contract-for-deed payment, a loan payment, or a tax payment, one of the partners would assume the responsibility to find a willing borrower with some creditworthiness, if possible. The partner would either call in a favor from the borrower or offer the borrower a $250 payment. The borrower would then visit Ettles at First Federal, where Ettles and the borrower would complete the loan application and the borrower would endorse the loan proceeds check over to Ettles or another partner. Ettles would fill in on the application a seemingly proper, though factually incorrect, purpose for the loan. He would normally state that the unsecured loan was for personal expenditures or personal investment so that no one at First Federal would suspect that the loan proceeds were actually going to RecCo or Davis Tailors.

With respect to a loan taken out by Becky Hewitt, an employee at Davis Tailors, the evidence showed that Willis had been involved in completing the loan application. Hewitt's application contained false information regarding her salary and assets, as well as a false statement regarding the expected use of the loan proceeds. Hewitt testified that she did not enter any of the false information and was not even aware of it. To the contrary, Willis testified that he may have filled in the incorrect numbers but that Hew-

---

**2.** These loans will be referred to as nominee loans or agent loans because the nominal borrower was actually obtaining the money for a third party's benefit. Nominee loans are not illegal per se. They are illegal, however, when

the borrower and the bank officer fail to state the real borrower and recipient of the funds, thereby obtaining the loans by means of false pretenses. *See* 18 U.S.C. § 1344 and § 2.

itt had supplied the information that he had written down.

For the most part, the partners were not able to repay these loans as they came due. As a result, they often had to convince the borrowers to renew the loans. Ettles also drafted letters of credit without First Federal's knowledge for several of the nominee borrowers, obligating the bank to repay the loan to itself if the loan was defaulted. When the partners failed to make timely payments on one of the nominee loans, the borrower presented his letter of credit to First Federal, which had no record of the letter's existence because Ettles had never placed a copy in the master file. The bank reluctantly acknowledged the letter of credit and ultimately wrote off the loan. The letter of credit raised the bank's suspicions regarding Ettles, who by this time had left the bank. The bank's investigation ultimately led to federal bank fraud charges against Ettles, Hopp, and Willis.

Ettles faced charges not only for the Rec-Co loans, but also for his dealings with Stuart Swann, a Sioux Falls developer. Ettles reached a plea agreement with the government whereby he pled guilty to bank fraud concerning the RecCo nominee loans, accepting gifts from Willis and Swann for procuring loans, and conspiring to defraud a federally insured bank. Ettles also promised to cooperate with the government's investigation and to testify against any of the other individuals involved in the two schemes. In exchange, the government agreed to drop any other charges against Ettles and to move the district court to reduce Ettles's offense level by two levels for acceptance of responsibility.

A federal grand jury returned a nine-count indictment against Hopp and Willis. Although Hopp initially entered a not guilty plea, he ultimately chose to enter a plea agreement. He pled guilty to one count of conspiring to defraud the bank and promised to cooperate with the government in exchange for the dismissal of the remaining counts against him. Hopp testified at Willis's trial and was later sentenced to ninety days' work release.

Willis elected to take his case to trial. The jury heard testimony for five days, ultimately returning a guilty verdict on all nine counts. The district court sentenced Willis to thirty-six months' imprisonment on the bank fraud and conspiracy counts, enhancing Willis's offense level by two levels for obstruction of justice, by six levels for the amount of loss, by two levels for more than minimal planning, and by four levels for his role as an organizer in the offense. The court also sentenced Willis to a concurrent thirty-six month term of imprisonment on the pre-Guidelines bribery count. Finally, the district court ordered Willis to pay restitution in the amount of $23,806.74.

Willis raises numerous arguments on appeal. He claims that the district court erred in denying his motion for a new trial based on the government's failure to produce discoverable material. Second, he argues that the district court improperly admitted evidence concerning the guilty pleas and convictions of Ettles and Hopp. Next, he claims that the district court improperly limited his cross-examination of Ettles and Howard Legge, a supervisor at First Federal. Finally, he raises several claims that the district court erred in imposing his sentence. We will address his arguments in turn.

## II.

After his trial but before the district court had entered the judgment of conviction, Willis moved the district court for a new trial based on newly discovered evidence. He claimed that he had discovered evidence that the government had failed to turn over prior to trial, in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and the Jencks Act, 18 U.S.C. § 3500. The district court denied Willis's motion without an evidentiary hearing.

On appeal, Willis claims that the district court erred in denying the motion. He states that the government failed to produce the following evidence which would have affected the jury's determination of his case: (1) the complete plea agreement between the government and Ettles, namely, that the government allegedly dropped eighteen counts against Ettles in exchange for his plea, coop-

eration, and testimony; (2) the sentencing transcripts of Ettles and Stuart Swann, which allegedly show that Ettles initially came up with the idea of seeking nominee borrowers in the earlier scheme not involving Willis and Hopp; and (3) FBI reports describing conversations between Ettles and FBI agents. Willis argues that these items would have allowed him to effectively impeach Ettles's credibility at trial, which he claims was the linchpin of the government's case.

In *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." The Court has subsequently defined what nondisclosed evidence it considers material:

> The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

*United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). This standard of materiality applies to all situations where the prosecution failed to produce evidence favorable to the defense, regardless of the type of request made by the defense. *Bagley,* 473 U.S. at 682–83, 105 S.Ct. at 3383–84. Also, the government's obligation to produce favorable testimony and the standard of materiality apply with equal force to impeachment evidence as well as directly exculpatory evidence. *Id.* at 676, 105 S.Ct. at 3380.

Willis initially claims that the government failed to inform the defense of the complete plea agreement between the United States and Ettles. He asserts that the government agreed to forego prosecuting additional counts relating to both the RecCo loans and the Swann transactions in exchange for Ettles's guilty plea and cooperation. Willis claims that had he known of this

at trial he could have more effectively impeached Ettles's credibility by showing that Ettles was testifying solely to curry the government's favor in his own prosecution. Willis relies on *Reutter v. Solem,* 888 F.2d 578, 581–82 (8th Cir.1989), in which we reversed the district court's denial of habeas corpus relief where the prosecution had failed to inform the defense that the state's "star witness" had a commutation hearing pending at the time of the defendant's trial and the prosecution's suggestions to the parole board would be accorded considerable weight.

In response, the government acknowledges that it did not produce Ettles's plea agreement. It states, however, that the plea agreement was filed with the district court in June 1991, ten months before Willis's trial. Ettles's written plea agreement stated that it was the entire agreement between the parties. It also stated on its face that no further criminal charges would be brought against Ettles relating to his conduct as an officer of First Federal in exchange for his guilty plea and cooperation.

In light of the above, we find no *Brady* violation. Ettles's plea agreement was a matter of public record, fully available to Willis. Counsel for Willis certainly knew that Ettles had entered a plea agreement involving the RecCo and Swann schemes because he acknowledged having seen Ettles's and Hopp's plea agreements on the morning that the trial began. Additionally, he had earlier sent an investigator to the federal prison in Yankton, South Dakota, to interview Ettles. Counsel also surely must have expected that Ettles, as a coconspirator, would play a substantial part in the government's case at Willis's trial. Accordingly, he may not now complain that he did not investigate a coconspirator's criminal court file in the same case to locate items with which to impeach the coconspirator. The plea agreement in the public file would have given counsel the terms of the bargain, with which he could have impeached Ettles.

The failure by the prosecution to turn over material contained in a public file does not result in the denial of a fair trial when defense counsel fails to exercise diligence in

investigating the file. *Lugo v. Munoz*, 682 F.2d 7, 10 (1st Cir.1982); *see also United States v. Oliver*, 908 F.2d 260, 262–62 (8th Cir.1990) (no *Brady* violation where defense counsel knew name and possible location of witness not within prosecutor's exclusive control but did not exercise reasonable diligence in locating address of witness to interview her). Likewise, we hold that the government's failure to turn over Ettles's plea agreement in this case when it was contained in Ettles's district court file did not deny Willis a fair trial. Counsel for Willis acknowledged that he knew of the plea agreements but failed to investigate Ettles's file. Due process does not require the prosecution to turn over its entire file or to do the defense counsel's work. *See United States v. Pou*, 953 F.2d 363, 366 (8th Cir.), *cert. denied*, —— U.S. —— & ——, 112 S.Ct. 1982 & 1983, 118 L.Ed.2d 580, 581 (1992).

This case is unlike *Reutter v. Solem*. In *Reutter*, the state knew that the commutation hearing of one of its key witnesses, David Trygstad, had been postponed until after Trygstad had testified in Reutter's trial. In fact, the assistant attorney general who was prosecuting Reutter was a member of the parole board scheduled to hear Trygstad's petition. 888 F.2d at 580. Nonetheless, the state did not tell Reutter about Trygstad's scheduled hearing. We held that the state's failure to disclose that fact violated Reutter's due process rights because it prevented Reutter's counsel from effectively cross-examining Trygstad concerning his motivation and bias. *Id.* at 581. There was no indication in that case, however, that Reutter's counsel had any reason to think that Trygstad, who had already been sentenced, was now seeking commutation of his sentence before the parole board. To the contrary, Willis knew of Ettles's plea agreement and sentencing and yet did nothing.

Second, Willis argues that the government failed to produce the sentencing transcripts for Ettles and Swann. Willis claims that these transcripts contain evidence that it was Ettles's idea to recruit nominee borrowers in the Swann scheme. Thus, he argues that he could have impeached Ettles's testimony that it was Willis who initiated the recruitment of nominee borrowers for Rec-Co.

We reject this argument for the same reason given with respect to Ettles's plea agreement. Because these transcripts were ordered by individuals connected to Ettles and Swann, the government was unaware that they had even been transcribed until Willis included them in his motion for a new trial. All of the sentencing transcripts were filed in the district court's files and were equally available to the prosecution and the defense. Moreover, we note that counsel for Willis cross-examined Ettles on the fact that he had entered a guilty plea to a charge arising from the Swann transactions as well as the RecCo loans. Having known of Ettles's plea, defense counsel had a duty to use reasonable diligence in investigating Ettles's court file. Thus, we cannot say that Willis was denied his right to a fair trial.

Finally, Willis argues that district court should have granted a new trial because the government failed to turn over FBI routine investigation reports ("FBI 302s") concerning conversations that agents had with Ettles. Willis contends that, at the very least, the district court should have reviewed the FBI 302s *in camera* to see if they contained Jencks or *Brady* material.

The Jencks Act requires the production of any statements made by a government witness after the witness has testified on direct examination for the prosecution. In this case, the district court's discovery order directed the government to produce Jencks Act statements before trial. The Act defines those statements to which it applies as, among others, "(1) a written statement made by said witness and signed or otherwise adopted or approved by him [and] (2) a stenographic, mechanical, electrical or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by such witness and recorded contemporaneously with the making of such oral statement." 18 U.S.C. § 3500(e)(1)–(2).

Willis has failed to raise a colorable claim that the FBI 302s that he seeks are "statements" for purposes of the Jencks Act. Be-

fore trial, the government told Willis that it was producing the three FBI 302s that had been shown to and adopted by government witnesses and therefore qualified as Jencks Act statements. Willis has failed to offer any reason to believe that the government was not telling the full truth. He has not produced any support for a claim that the 302s concerning interviews with Ettles were signed or adopted by him (or even seen by him) or that they contained substantially verbatim statements that were contemporaneously recorded.

We also find that Willis's claim fails under *Brady.* The only support for Willis's claim that the FBI 302s are material under the *Bagley* standard arises from statements made by an FBI agent at Ettles's sentencing hearing. In response to a question by the prosecutor concerning one of Ettles's objections to his presentence report, the agent stated that Ettles had told him during an interview that Willis had come up with the idea of seeking nominee borrowers for Rec-Co, but that Ettles had admitted discussing the idea with his two partners. This statement shows that Ettles directly inculpated, rather than exculpated, Willis. Accordingly, even if the 302s contained a few seemingly inconsistent statements with which Willis could have further impeached Ettles, we are confident that the reports as a whole were not material under *Bagley* because they directly inculpated Willis. Willis has failed to show how these reports undermine confidence in the trial's outcome.

### III.

◼ Next, Willis argues that the district court incorrectly applied Eighth Circuit precedent in allowing the government to introduce evidence concerning Ettles and Hopp's plea agreements and guilty pleas. Although the government stepped close to the line on this issue, we disagree with Willis's contention that the district court committed reversible error.

The district court has broad discretion in admitting evidence, and its decision will be overturned on appeal only if its ruling constitutes an abuse of that discretion. *United States v. Collins,* 949 F.2d 1029, 1031 (8th Cir.1991). Moreover, "[t]he discretion accorded lower courts in determining admissibility of evidence 'is particularly broad in a conspiracy trial.' " *United States v. Kroh,* 915 F.2d 326, 331 (8th Cir.1990) (en banc) (citation omitted).

In this circuit, the rule is well-established that "a confederate's guilty plea is admissible, *even on the Government's direct examination of the witness,* as evidence of the witness' [sic] credibility, or of his acknowledgement of participation in the offense." *Kroh,* 915 F.2d at 331 (emphasis in original) (quoting *United States v. Hutchings,* 751 F.2d 230, 237 (8th Cir.1984), *cert. denied,* 474 U.S. 829, 106 S.Ct. 92, 88 L.Ed.2d 75 (1985)); *see also United States v. Drews,* 877 F.2d 10, 12 (8th Cir.1989); *United States v. Braidlow,* 806 F.2d 781, 783 (8th Cir.1986). "The witness's plea or evidence thereof, however, 'cannot be used as substantive evidence of the defendant's guilt,' and the jury should be so instructed." *Kroh,* 915 F.2d at 331 (quoting *Hutchings,* 751 F.2d at 237).

Where evidence concerning confederates' guilty pleas was not used as substantive evidence of the defendant's guilt and was followed by a limiting instruction, we have given broad discretion to the court in ruling on the admission of such evidence. *See Kroh,* 915 F.2d at 331–32 (no error where government mentioned confederate's plea three times in course of six-day trial and court twice gave limiting instruction); *Braidlow* 806 F.2d at 783 (evidence of guilty pleas not improperly used or emphasized and limiting instruction given each time evidence of pleas introduced); *Hutchings,* 751 F.2d at 237 (no abuse of discretion in admitting evidence of defendant's employee's guilty plea to aiding and abetting defendant in relation to the offenses charged against defendant where evidence not emphasized and limiting instruction given). Moreover, we have even upheld the district court's admission of witness-coconspirators' written plea agreements. *Drews,* 877 F.2d at 12 (no suggestion by government that it had independently verified coconspirators' testimony and limiting instruction given).

In this case, the Assistant United States Attorney (the "prosecutor") mentioned Ettles and Hopp's pleas five times during the course of a complex five-day trial. Defense counsel did not object to the prosecutor's mentioning of the guilty pleas during opening statements. Accordingly, Willis has waived any objection concerning those statements. *See United States v. Trent*, 949 F.2d 998, 999 (8th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 3005, 120 L.Ed.2d 880 (1992).

With respect to the other times that the prosecutor mentioned the guilty pleas, we cannot say that the district court abused its discretion in admitting the evidence or argument. In the case of Hopp's plea, the prosecutor dealt only briefly with the plea in the midst of the direct examination, and the district court immediately gave an appropriate limiting instruction. Although the prosecutor did begin her direct examination of Ettles by asking him whether he had pled guilty to bank fraud on the same facts as were alleged in Willis's indictment, her questions outlining the terms of the plea comprise only one and a half pages of transcript. Moreover, the district court again immediately gave the jury a limiting instruction. The prosecutor then did not mention Ettles's plea during the remainder of her lengthy direct and redirect examination. We also find that it was proper for the prosecutor to introduce evidence concerning Ettles's promise to testify truthfully to rehabilitate Ettles's credibility when recalled as a rebuttal witness. *See Kroh*, 915 F.2d at 332 (holding that it was proper for government to ask about similar "truthful testimony" promise on redirect to impeach the confederate's cross-examination testimony).

It is clear that at no time was the evidence of Ettles and Hopp's guilty pleas used as substantive evidence of Willis's guilt. We hold that when considered in the context of five days of testimony and in light of the district court's limiting instructions both during Ettles and Hopp's testimony and at the end of the trial, the district court did not abuse its discretion in admitting evidence of the confederates' guilty pleas.

## IV.

Willis next argues that the district court violated his right to confront the witnesses against him guaranteed by the Sixth Amendment by improperly cutting off his cross-examination of Ettles and Howard Legge, one of the officers at First Federal responsible for reviewing Ettles's actions.

The Confrontation Clause of the Sixth Amendment guarantees to a defendant the opportunity for effective cross-examination of witnesses against him, including inquiry into the witnesses' motivation and bias. *Delaware v. Van Arsdall*, 475 U.S. 673, 678–79, 106 S.Ct. 1431, 1434–35, 89 L.Ed.2d 674 (1986). The Confrontation Clause, however, does not prevent a trial judge from placing limits on defense counsel's cross-examination of government witnesses. *Id.* at 679, 106 S.Ct. at 1435. "On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Id.; see also United States v. Klauer*, 856 F.2d 1147, 1149 (8th Cir.1988). "A trial court's decision to limit cross-examination will not be reversed 'unless there has been a clear abuse of discretion and a showing of prejudice to defendant.'" *Klauer*, 856 F.2d at 1149 (quoting *United States v. Lee*, 743 F.2d 1240, 1249 (8th Cir.1984)).

Willis's extensive cross-examination of Ettles comprises forty-nine pages of trial transcript. The only limitation on the cross-examination occurred when defense counsel attempted to pin Ettles down concerning the dollar amount of kickbacks that he had received from Stuart Swann in the unrelated fraudulent scheme. At that point, the district court sustained the government's objection as to the dollar amount. The district court did allow defense counsel to elicit testimony from Ettles that he had in fact received cash kickbacks from Swann and that he had pled guilty to a charge involving those kickbacks.

We fail to see how the district court abused its discretion in a way that prevented Willis from confronting Ettles. The Swann scheme was a totally unrelated fraud and thus only marginally relevant to the RecCo loans that were the focus of Willis's trial. Moreover, the district court did allow Willis to force Ettles to admit that he had in fact received kickbacks from Swann in addition to Willis. Any testimony concerning the specific amount would have had no real relevance to the case against Willis.

■ The government also called Howard Legge, a former First Federal vice president in charge of consumer lending. Legge testified on direct examination regarding the bank's internal procedures and regulations and the necessity of following those procedures to ensure informed decision-making by First Federal. On cross-examination, defense counsel asked Legge whether there were situations other than the RecCo nominee loans in which Ettles's superiors at First Federal had found him to be violating the bank's policies. When defense counsel attempted to ask Legge about a specific instance of Ettles's failure to follow bank policy, the government objected. The district court sustained the objection.

Willis argues that had he been able to further cross-examine Legge on this point, he would have been able to bolster the defense's theory that Ettles was acting entirely on his own in improperly making the nominee loans and that Ettles hid his improprieties concerning the RecCo loans from Willis to avoid detection of all of Ettles's other schemes.

We cannot agree that the district court's ruling constituted an abuse of discretion. Ettles's testimony that he had improperly completed the loan applications for the Rec-Co nominee borrowers was uncontested. Thus, the issue that remained for the jury to decide was whether Willis had known of and been involved with the false loan applications. That Ettles had engaged in improper practices with other individuals at other times had no real relevance to the question of Willis's knowledge and participation. Accordingly, the district court did not err in restraining Willis's counsel from using Legge to place Ettles on trial for unrelated events.

## V.

### A. *Obstruction of Justice Enhancement*

■ Willis raises several arguments concerning his sentence. First, he argues that the district court incorrectly imposed, *sua sponte*, a two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1 without providing sufficient notice. Willis relies on *Burns v. United States*, in which the Supreme Court held that "before a district court can *depart upward* on a ground not identified in the presentence report or in a presentencing submission by the Government, [Federal Rule of Criminal Procedure] 32 requires that the district court give the parties reasonable notice that it is contemplating such a ruling." —— U.S. ——, ——, 111 S.Ct. 2182, 2187, 115 L.Ed.2d 123 (1991) (emphasis added).

Willis's Presentence Report ("PSR") stated that "[t]he probation officer has no information indicating the defendant impeded or obstructed justice." Nonetheless, at the sentencing hearing the district court informed Willis that it was considering imposing an obstruction enhancement. After hearing argument on the issue by defense counsel, the court ultimately decided to impose the enhancement based on the evidence it had heard at trial.

Willis's argument that the district court could not impose the enhancement without giving prior notice of its intention to do so is foreclosed by our recent opinion in *United States v. Adipietro*, 983 F.2d 1468 (8th Cir. 1993). In *Adipietro*, the district court, *sua sponte*, imposed a three-level enhancement under U.S.S.G. 3B1.1(b) for being a manager or supervisor in a criminal activity involving five or more participants, although the presentence report had recommended only a two-level enhancement under section 3B1.1(c). In response to the same notice argument now advanced by Willis, we held that "*Burns* does not mandate that adequate notice be given before a district court [*sua sponte*] addresses an *adjustment* or *enhancement*." *Id.* at 1473 (emphasis in original); *see also United States v. Canada*, 960

F.2d 263, 267 (1st Cir.1992) (holding that guidelines themselves provide sufficient notice of potential adjustments to meet Rule 32's requirements where PSR contained similar "no information" language). Likewise, given the fact that Willis knew of the potential bases for enhancement in the guidelines and the potential factual bases in the trial testimony, he cannot now claim that he was surprised and unable to comment at the sentencing hearing.

██ Willis also argues that the district court's reasons for imposing the obstruction enhancement were insufficient. We disagree. The district court found that Willis had given perjurious testimony during the course of the trial, especially regarding the Hewitt loan application, and that the trial testimony had shown that Willis had sent kickback checks to Ettles in the name of a fictitious company to avoid detection. The court relied on evidence that it had heard at trial, and we cannot say that its express factual findings were clearly erroneous. *See United States v. Womack*, 985 F.2d 395, 398 (8th Cir.1993) (perjury justifies obstruction enhancement under U.S.S.G. § 3C1.1); *United States v. Johnson*, 962 F.2d 1308, 1313 (8th Cir.1992) (review district court's factual findings supporting obstruction enhancement for clear error), *cert denied sub nom. Woodards v. United States*, —— U.S. ——, 113 S.Ct. 1418, 122 L.Ed.2d 788 (1993).

## B. *Calculation of Loss from Fraud*

██ Willis challenges the district court's six level increase to his base offense level based on the court's calculation of the amount of loss caused to the bank by Willis's fraud. We review the district court's calculation of loss under U.S.S.G. § 2F1.1 as a factual issue under the clearly erroneous standard. *See United States v. George*, 986 F.2d 1176, 1179 (8th Cir.1993); *United States v. Earles*, 955 F.2d 1175, 1180 (8th Cir.1992). We review de novo, however, the district court's interpretation of the guidelines and the application of that interpretation to the

case's particular facts. *See United States v. Mills*, 987 F.2d 1311, 1315 (8th Cir.1993).

In cases involving fraud and deceit, U.S.S.G. § 2F1.1 provides the appropriate formula for determining the base offense level. Section 2F1.1 begins with a base offense level of six. It then increases the offense level according to the amount of loss caused by the defendant's fraudulent scheme. Application Note 7 to Section 2F1.1 states that the court should calculate "loss" as either the actual loss caused by the defendant's conduct or the intended loss, whichever is greater. *See United States v. Prendergast*, 979 F.2d 1289, 1292 (8th Cir.1992); *United States v. Edgar*, 971 F.2d 89, 93 (8th Cir.1992). The 1991 version of Application Note 7, which was applicable at Willis's sentencing,[3] contained an amendment that provided an example of how to calculate loss in a fraudulent loan application case:

> In fraudulent loan application cases ..., the loss is the actual loss to the victim (or if the loss has not yet come about, the expected loss). For example, if a defendant fraudulently obtains a loan by misrepresenting the value of his assets, the loss is the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered, or can expect to recover, from any assets pledged to secure the loan.

U.S.S.G. § 2F1.1, comment. (n. 7(b)) (as amended, effective November 1, 1991).

Willis argues that the addition of subsection (b)'s language in the 1991 version of Application Note 7 mandates that the district court should have calculated the loss in Willis's case as the actual (net) loss suffered by First Federal after Willis and his partners had repaid part of the nominee loans. We do not agree.

██ Although the language in subsection (b) speaks in terms of actual loss calculated after a bank's recovery, we believe that the 1991 version of Application Note 7 still allowed the district court to calculate the loss in a fraudulent loan application case on the

---

**3.** Unless ex post facto concerns mandate otherwise, the sentencing court applies the guidelines in effect at the time of sentencing. 18 U.S.C. § 3553(a)(4)–(5); *see also United States v. Bell*,

991 F.2d 1445, 1448 (8th Cir.1993) ("the ex post facto clause is violated if [a] later, more onerous Guideline [in effect at the time of sentencing] is applied").

alternative basis of the amount of loss intended by the fraudfeasor. The first paragraph in Application Note 7 specifically stated that "if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss." U.S.S.G. § 2F1.1, comment. (n. 7) (Nov. 1991). Moreover, we note that the Sentencing Commission clarified this point in the 1992 version of Note 7 by expressly stating in subsection (b) that "where the intended loss is greater than the actual loss, the intended loss is to be used." U.S.S.G. App.C., amend. 470 (Nov. 1992). Although the clarification contained in the 1992 amendment does not compel our conclusion regarding the 1991 version of Application Note 7, it does support our interpretation of the 1991 version.

This does not mean that a sentencing court is always free to use the face value of fraudulently obtained loans as the loss amount for applying the adjustments in section 2F1.1. Application Note 7 specifically directs the sentencing court to use either intended or actual loss, and as we noted in *Edgar*, "intended loss is not the same as possible or potential loss." 971 F.2d at 95. Where the district court finds, however, that the defendant intended to defraud the bank of the entire amount of the loans obtained by a false loan application, it remains free to use the total amount as the loss for purposes of section 2F1.1. *Cf. United States v. Ravoy*, 994 F.2d 1332, 1334–35 (8th Cir.1993) (upholding district court's finding that loss amount in equity skimming case should include the lender's loss on a property sold by defendants to individual who subsequently defaulted on mortgage where evidence showed that defendants intended the loss during time they held the property); *Mills*, 987 F.2d at 1316 (upholding district court's finding of loss as full amount of money taken from victims although defendant had later repaid some of the money in response to threats of legal action); *United States v. Saunders*, 957 F.2d 1488, 1494 (8th Cir.) (affirming district court's calculation of loss as entire amount of nonsufficient funds checks written by defendant although defendant's girlfriend had covered some of the checks), *cert. denied*, ── U.S. ──, 113 S.Ct.

256, 121 L.Ed.2d 187 (1992), and *cert. denied sub nom., Coleman v. United States*, ── U.S. ──, 113 S.Ct. 991, 122 L.Ed.2d 143 (1993).

At the sentencing hearing, the district court rejected Willis's argument that it should use the actual net loss suffered by First Federal as the amount of loss under section 2F1.1. The court agreed with the government that Willis had intended to defraud First Federal to the extent of the entire amount of the seven nominee loans, calculated in the PSR to total more than $77,000. We cannot say that this finding is clearly erroneous. All of the loans were unsecured, with the exception of the loan to Becky Hewitt, for which Willis put up as collateral a Davis Tailors' van worth only some two thousand dollars. Moreover, Willis and his partners repeatedly persuaded the nominee borrowers into renewing the loans when the partners were unable to make the necessary payments.

## C. *Enhancement for Role in Offense*

The district court increased Willis's offense level by four levels under U.S.S.G. § 3B1.1 for being an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive.

 Willis initially challenges the enhancement on the grounds that it double counted conduct that the district court used to support a two-level adjustment for more than minimal planning under section 2F1.1(b)(2). Willis relies on *United States v. Romano*, 970 F.2d 164, 167 (6th Cir.1992), in which the Sixth Circuit held that "§ 3B1.1(a) already takes into account the conduct penalized in § 2F1.1(b)(2) because, by its very nature, being an organizer or leader of more than five persons necessitates more than minimal planning."

We respectfully disagree with the Sixth Circuit's conclusion. The sentencing guidelines do not expressly forbid the application of both section 2F1.1(b)(2) and section 3B1.1. Moreover, as Judge Siler noted in dissent in *Romano*, the enhancement under section 2F1.1(b)(2) "increases the base offense level for the crime itself, whereas § 3B1.1 pro-

vides an aggravating role enhancement because the defendant was the organizer or leader of a criminal activity with several participants." The two sections consider different aspects of the defendant's conduct. Section 2F1.1(b)(2) increases the punishment where the defendant's crime evidenced planning and forethought, showing a disregard for the rule of law. Section 3B1.1 recognizes the additional culpability that a defendant should bear for being a leader or organizer of a criminal activity that involves more than five participants. The Sentencing Commission based the enhancement for the defendant's role in the offense on the grounds that leaders or organizers "tend to profit more from [the crime] and present a greater danger to the public and/or are more likely to recidivate." U.S.S.G. § 3B1.1, comment. (backg'd). We agree with Judge Siler's conclusion that "if the crime has its base offense level increased for more than minimal planning it should be enhanced again if the defendant is the one who organized or led the planning of the offense." *Romano*, 970 F.2d at 168 (Siler, J., dissenting).

With respect to the district court's factual findings, "[w]e will reverse a determination of a defendant's role in criminal activity only if it is clearly erroneous." *United States v. Schwarck*, 961 F.2d 121, 123 (8th Cir.1992). We find no error here. The district court found that Willis was the "dominating force in this conspiracy." The trial testimony showed that Willis exercised control over the financial affairs at both Davis Tailors and the Rec Bowl and directed the proceeds from the nominee loans to avoid detection and keep the businesses afloat. Moreover, Willis was actively involved in recruiting most of the nominee borrowers.

## VI.

We have considered Willis's additional claims of error and find them to be without merit.

The judgment is affirmed.