# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 97-2176

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Harold J. Jones, | * |
| | * |
| Appellant. | * |

_____

No. 97-2177

_____

Appeals from the United States
District Court for the
Western District of Missouri.

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| James O. Cashaw, | * |
| | * |
| Appellant. | * |

_____

No. 97-2178
_____

United States of America,        \*

                                        \*

        Appellee,          \*

                                        \*

     v.                   \*

                                        \*

John L. Palmer,           \*

                                        \*

        Appellant.        \*

_____

Submitted:  January 14, 1998

Filed:  November 17, 1998
_____

Before WOLLMAN, BRIGHT, and HEANEY, Circuit Judges.
_____

WOLLMAN, Circuit Judge.

In this consolidated appeal, Harold J. Jones, James O. Cashaw, and John L. Palmer appeal from their convictions and from the sentences imposed by the district court[1] for conspiracy to possess with intent to distribute cocaine and cocaine base, in violation of 21 U.S.C. §§ 841(a)(1)-(b)(1) and 846.  We affirm on all issues other than

_____

[1]The Honorable Joseph E. Stevens, Jr., United States District Judge for the Western District of Missouri.

Cashaw's four-level enhancement as a leader or organizer of a criminal activity involving five or more participants.[2]

## I.  Background

On November 5, 1991, Los Angeles, California, police made several arrests as the culmination of their investigation of an extensive narcotics distribution ring.  The distribution operation included dozens of conspirators in numerous major cities, including Los Angeles, Kansas City, Atlanta, Detroit, Houston, and Denver.  Anthony Rashid, one of the individuals arrested and a central figure in the conspiracy, ultimately cooperated with authorities.  Rashid assisted the government in examining the full scope of his operation and identified key co-conspirators.  Investigation revealed that Rashid's operation functioned as a conduit for smuggling massive amounts of cocaine and crack cocaine from sources in Houston and Los Angeles to other major metropolitan areas for further distribution.  Drugs and cash were smuggled in airline baggage, automobile tires, and containers within automobile gasoline tanks.  As a result of the investigation, Jones, Cashaw, and Palmer were charged with conspiracy to possess with intent to distribute cocaine.  Jones was also charged with a criminal forfeiture count under 21 U.S.C. § 853.  Although many of the participants in Rashid's conspiracy eventually entered into plea agreements with the government, Jones, Cashaw, and Palmer were tried, convicted, and sentenced for their involvement.  The district court sentenced Cashaw to 360 months' imprisonment, while Palmer and Jones were given 235-month terms each.

The government's case consisted of testimony from co-conspirators and circumstantial evidence obtained by investigators.  Evidence established that Jones, who sent large amounts of cash to Rashid and received large amounts of Rashid's cocaine bound for Kansas City, was Rashid's principal distributor in the Kansas City

---

[2]Judge Wollman would affirm on this issue.

area.  Testimony also established that Jones's involvement included acting as a courier between Rashid and Bruce Pompey, Rashid's brother, and providing Rashid with a .22 revolver and silencer.  Cashaw, whose involvement placed him high in the distribution chain, was responsible for supplying Rashid with substantial amounts of cocaine.  Cashaw was also involved with Rashid as a partner in the foiled Los Angeles transaction that resulted in Rashid's arrest and the seizure of 76 kilograms of cocaine.  Palmer, who was often called upon to ferry drug-laden automobiles to distribution points and to smuggle large amounts of cash back to the source cities, was one of Rashid's principal couriers.

The defendants raise a number of issues on appeal.  All three allege prosecutorial misconduct, contending that their convictions were the product of either the knowing, reckless, or negligent use of false testimony, or the failure to disclose exculpatory information in violation of Brady v. Maryland, 373 U.S. 83 (1963).  They also argue that the district court made inadequate findings regarding drug amounts and erroneously concluded that it was without authority to grant downward departures.  Additionally, Jones raises jury instruction issues and a Fifth Amendment claim, Cashaw challenges his sentence enhancement, and Palmer contends that the government failed to present sufficient evidence to support his conviction.

## II.  Prosecutorial Misconduct

The first allegation of prosecutorial misconduct concerns the government's representations made to the jury regarding a reduction in Rashid's sentence.  Rashid's guilty plea and subsequent cooperation were the product of the government's promises of a sentence reduction.  Prior to the defendants' trial, Rashid received a sentence of 120 months, reduced from an initial sentencing range of 360 months to life.  During his testimony in the present case, Rashid acknowledged that his sentence had been reduced as a result of the government's motion.  Rashid then went on to testify that FBI Agent

Mark Foxhall had promised him two sentence reductions. There then followed this exchange between the prosecutor and Rashid:

> Q. Has that matter been discussed with you by representatives of the U.S. Attorneys Office, specifically have I spoken with you about it?
>
> A. Yes, you have. And you have indicated you have no intention of following through with that.
>
> Q. Did you indicate also that it is your intention to litigate that at a later time?
>
> A. Absolutely.

Rashid later filed a motion pursuant to 28 U.S.C. § 2255 seeking the second reduction. The government did not oppose Rashid's motion, and the district court[3] further reduced his sentence from 120 months to five years. (By the time of the sentencing in the present case, Rashid had served his time and was no longer in custody.) The defendants contend that the government never intended to oppose Rashid's second reduction and therefore misrepresented its intentions to the jury.

Ronald Whitley, a drug courier in the conspiracy, offered incriminating testimony against all three defendants. He received a 120-month sentence pursuant to a written plea agreement with the government. Prior to the entry of Whitley's guilty plea, a teleconference took place between Whitley's counsel, a government attorney, and Whitley's sentencing judge.[4] During the conference, the court indicated its intention to sentence Whitley as a minimal participant and impose a sentence of not more than

---

[3]The Honorable Scott O. Wright, United States District Judge for the Western District of Missouri.

[4]Judge Wright.

-5-

ten years. The court further stated that Whitley could receive a lesser sentence if he agreed to cooperate with the government. Later, at his plea and sentencing, Whitley denied any involvement with drugs, other than handling money that he thought was drug proceeds, and denied responsibility for or knowledge of any particular quantity of drugs. The defendants, who sought full disclosure of all Brady material in pretrial motions, allege that the government never provided them with any of the information relevant to Whitley's plea agreement or statements made during the teleconference.

During Whitley's direct examination in the present case, he stated that he was testifying pursuant to an agreement with the government; that he had received a ten-year sentence; that he had agreed to testify subsequent to his sentencing; and that the government had agreed to file a motion pursuant to Fed. R. Crim. P. 35(b) in exchange for his cooperation. Later, on redirect, the following colloquy occurred:

[The Government]: Were you told if you were caught lying about anything your plea agreement would be torn up and thrown into the wind?

Whitley: Yes.

[Jones's Attorney]: I object. That is a misrepresentation. I don't think there is a plea agreement in this case. At least I haven't been provided one by the government.

[The Government]: There was a Rule 35 filed on your behalf.

[Jones's Attorney]: There was a motion. It doesn't say anything about that.

The Court: I think the plea agreement may be a loose way to describe the understanding. There is no written plea agreement as I understand it.

[The Government]: No.

Trial Transcript at 676-77.

## A.

The defendants argue that the government knowingly presented false testimony by leading the jury to believe that it intended to oppose Rashid's request for a second sentence reduction. The defendants have presented no evidence to support their bare assertion that the government had no intention of opposing Rashid's second reduction. Rather, they suggest that the representation made to the jury was false because the government subsequently failed to oppose the reduction. We conclude, however, that the record adequately explains why the government did not follow through on its earlier-held intention to oppose the second reduction.

In a presentencing hearing before Judge Stevens (held some two years after the trial), the government explained that it had made no objection to Rashid's bid for a further sentence reduction because of Judge Wright's unequivocallyexpressed intention to grant the reduction on his own motion (why, we do not know) and his refusal to brook any opposition to such a course of action. As an additional reason, the government stated that Agent Foxhall had been dismissed by the FBI for irregularities in dealing with a confidential informant and was nowhere to be found, leaving the government without evidence to oppose Rashid's contention that he had been promised an additional sentence reduction. This explanation, which we accept as true, reflects little credit on the manner in which Rashid's case was handled, but it refutes the defendants' contention that the government was guilty of falsely representing to the jury that it intended to oppose a further reduction in Rashid's sentence. Moreover, any impact on the jury's assessment of Rashid's credibility resulting from the announcement of the government's then-held intention to oppose such a reduction must necessarily have been minimal in light of the fact that Rashid had already received a

most substantial reduction in his sentence. Finally, Rashid's testimony was not the only evidence against the defendants. As indicated below, the government introduced substantial evidence linking the defendants to the conspiracy. Accordingly, we conclude that the defendants' claim of prosecutorial misconduct entitles them to no relief.

**B.**

The defendants argue that the colloquy during Whitley's testimony constituted a false representation to the jury because Whitley had in fact entered into a written plea bargain with the government. As the government points out, however, Whitley himself did not testify that there was no written plea bargain. When read in context, the prosecutor's "No" in response to the district court's statement that there was no written plea agreement constituted an inadvertent misstatement in view of Whitley's earlier acknowledgment that his plea bargain would be torn up and thrown into the wind if he was caught lying. At worst, the government's response constituted harmless error in light of the totality of the evidence against the defendants. The testimony of no fewer than six co-conspirators implicated the defendants in the conspiracy; physical evidence found in vehicles and buildings used in the conspiracy was linked to the defendants; and telephone pen registers linked the defendants to other members of the conspiracy. Additionally, defense counsel impeached Whitley's credibility with evidence of his prior denials to federal agents regarding Rashid's criminal activities and of his agreement to testify in exchange for a Rule 35(b) motion. Indeed, counsel's cross-examination elicited an admission from Whitley that he had lied to federal agents.

The defendants also contend that the government wrongfully withheld Brady evidence when it denied them what they characterize as "devastating impeachment evidence" concerning statements made during Whitley's sentencing and alleged improprieties surrounding his sentencing proceedings.

The government's failure to disclose evidence that is material to the issue of guilt and is exculpatory in nature violates a defendant's right to due process. See Brady, 373 U.S. at 87. Brady materiality is not evaluated by a sufficiency of evidence test. See Kyles v. Whitley, 514 U.S. 419, 434 (1995). However, materiality is not established by the mere possibility that the withheld evidence may have influenced the jury. See Knox v. Iowa, 131 F.3d 1278, 1283 (8th Cir. 1997). "Rather, there must be a reasonable probability that its disclosure would have led to a different result at trial, thus undermining confidence in the jury verdict." Id. There are a number of limitations to Brady, including the principle that information available from other sources or evidence already possessed by a defendant is not covered by the rule. See United States v. Gonzales, 90 F.3d 1363, 1368 (8th Cir. 1996).

We conclude that the prosecution's failure to disclose the existence of Whitley's plea agreement and alleged improper sentencing procedures does not undermine our confidence in the jury verdict. Whitley received a reduced sentence for his agreement to plead guilty, and he did not agree to testify against the defendants until after he had been sentenced and incarcerated. Whitley's testimony at the defendants' trial was the product of the government's promise to file a motion for a further reduction in Whitley's sentence. The defendants were aware of the government's promise, and they cross-examined Whitley on the subject. Thus, the alleged Brady material had little or no exculpatory value. Furthermore, although we may not rely solely on a sufficiency-of-evidence analysis to make a Brady determination, see Kyles, 514 U.S. at 434, it is of some significance that a wealth of other testimony was used to convict the defendants. It is not reasonably probable that disclosure of Whitley's plea agreement and alleged sentencing improprieties would have resulted in a different verdict.

Additionally, because transcripts of Whitley's plea and sentencing hearing were readily available, we reject the defendants' argument that the government wrongfully

withheld statements made by Whitley during the proceedings.[5]  See United States v. Jones, 34 F.3d 596, 600 (8th Cir. 1994).  There is no Brady violation if "the defendant[s], using reasonable diligence, could have obtained the information" themselves.  Westley v. Johnson, 83 F.3d 714, 726 (5th Cir. 1996), cert. denied, 117 S. Ct. 773 (1997).  See also United States v. Willis, 997 F.2d 407, 412-13 (8th Cir. 1993).

## III.  Drug Quantity Determinations

The defendants challenge the district court's findings regarding its drug quantity determinations and the credibility of the witnesses it relied upon in making those determinations.  Rule 32 of the Federal Rules of Criminal Procedure sets forth the procedure that the district court must follow when, as was the case here, a defendant challenges the factual accuracy of drug quantity information contained in the Presentence Report (PSR):

> For each matter controverted, the court must make either a finding on the allegation or a determination that no finding is necessary because the controverted matter will not be taken into account in, or will not affect, sentencing.  A written record of these findings and determinations must be appended to any copy of the presentence report made available to the Bureau of Prisons.

---

[5]The defendants also argue that the government's failure to turn over Whitley's statements was a violation of the Jencks Act, 18 U.S.C. § 3500 (1997).  The Jencks Act requires the presentation of any statements made by a government witness after the witness has testified on direct examination for the government.  See United States v. Willis, 997 F.2d 407, 413 (8th Cir. 1993).  Whitley's sentencing transcript, being a matter of public record, is not within the scope of the Jencks Act.  See United States v. Isgro, 974 F.2d 1091, 1095 (9th Cir. 1992); United States v. Harris, 542 F.2d 1283, 1293 (7th Cir. 1976); United States v. Munroe, 421 F.2d 644, 645 (5th Cir. 1970).

Fed. R. Crim. P. 32(c)(1). The sentencing guidelines provide that, when resolving such disputes, the sentencing court may consider relevant information that "has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3 (1997); see also United States v. Fetlow, 21 F.3d 243, 248 (8th Cir. 1994). To provide meaningful appellate review, Rule 32(c)(1) findings must meet a threshold standard of sufficiency. See Fetlow, 21 F.3d at 248; United States v. Candie, 974 F.2d 61, 65 (8th Cir. 1992). We review such findings for clear error. See United States v. Edwards, 994 F.2d 417, 423 (8th Cir. 1993).

Citing United States v. Candie, the defendants contend that the district court made inadequate findings regarding the credibility of government witnesses. See 974 F.2d at 65. We disagree. In Candie, the district court commented, "I assume I have no alternative but to accept that [trial] evidence." Id. Here, the district court made an express finding that it considered the witnesses to be credible. See Edwards, 994 F.2d at 423; United States v. Mills, 987 F.2d 1311, 1317 (8th Cir. 1993). "[W]itness credibility is an issue for the sentencing judge that is virtually unreviewable on appeal," Candie, 974 F.2d at 64, and we find no error in the district court's credibility findings.

The government must prove drug quantity by a preponderance of the evidence. See id. For each conspirator, the government must show that the quantities fell within the scope of criminal activity jointly undertaken by him and were reasonably foreseeable to him. See U.S.S.G. § 1B1.3 commentary at n.2; United States v. Townley, 929 F.2d 365, 370 (8th Cir. 1991).

The government established drug amounts attributable to each defendant through the trial testimony of numerous witnesses. The district court overruled the defendants' objections to the PSR drug quantity calculations and attributed more than 150 kilograms to each defendant. Although we prefer that district courts specify the basis for their drug quantity findings, see United States v. Randolph, 101 F.3d 607, 609 (8th Cir. 1996), we have held as adequate to satisfy the requirements of Rule 32(c)(1) a

-11-

clear statement by the district court that it "was relying on its impression of the testimony of the witnesses at trial, coupled with its specific rejection of the defendant's quantity objections." United States v. Flores, 73 F.3d 826, 835 (8th Cir.), cert. denied, 518 U.S. 1027 (1996). We are satisfied that the district court met this standard when it made its credibility findings and overruled the defendants' objections. The drug quantities were well supported by the evidence. Indeed, the testimony depicting the massive scale of Rashid's operations suggests that the district court's findings were, if anything, conservative. Accordingly, we find no error in the court's finding that the scope of criminal activity jointly undertaken by the defendants and reasonably foreseeable to each included more than 150 kilograms of cocaine.

## IV. Sentencing Disparities

All three defendants argue that the district court erroneously determined that it lacked authority to depart downward from the applicable Sentencing Guidelines range. The court, concerned about the disparities between the sentences given the cooperating co-conspirators and those it believed it was required to impose upon the defendants, expressed a desire to depart but concluded that it was bound by law to stay within the Guidelines.

The defendants argue that the Sentencing Commission has implicitly encouraged sentencing disparity between codefendants as a departure factor. Our decisions are clear, however, that the disparity between sentences is not a permissible basis for departure. See, e.g., United States v. Wong, 127 F.3d 725, 728 (8th Cir. 1997); United States v. Polanco, 53 F.3d 893, 897 (8th Cir. 1995); United States v. Torres, 921 F.2d 196, 197 (8th Cir. 1990) (per curiam). Accordingly, the district court did not err in ruling that the disparity in the sentences given the testifying co-conspirators did not authorize it to grant downward departures to the defendants.

-12-

Jones cites Wong, 127 F.3d at 729, for the proposition that the district court had authority to grant him a downward departure because he was gainfully employed, maintained a relationship with his son, attended church, had significant debts, and had an excellent reputation in the community. Although a district court may consider family ties and responsibilities in "extraordinary or exceptional" cases, we find no basis to characterize Jones's circumstances as extraordinary or exceptional. He has not shown that his family's position differs substantially from that of other families similarly situated. See United States v. Kapitzke, 130 F.3d 820, 822 (8th Cir. 1997).

## V. Individual Issues on Appeal

Cashaw challenges the district court's four-level enhancement for his aggravating role as a leader or organizer of a criminal activity involving five or more participants.[6] See U.S.S.G. § 3B1.1(a). This factual finding is reviewed for clear error. See United States v. Mayer, 130 F.3d 338, 339 (8th Cir. 1997). Cashaw first argues that the court erroneously relied on challenged portions of his PSR and failed to make adequate findings regarding his role in the conspiracy. See Fed. R. Crim. P. 32(c)(1). I disagree. As noted above, the district court made adequate credibility findings regarding the government witnesses, and the role enhancement was supported by evidence that Cashaw was instrumental in arranging for the movement and distribution of large amounts of drugs. See United States v. Scott, 91 F.3d 1058, 1062-63 (8th Cir. 1996). Likewise, I find no merit in Cashaw's contention that there was no evidence to support the four-level enhancement. The definition of leadership or organization is to be construed broadly. See Mayer, 130 F.3d at 340. I conclude that there was ample evidence that Cashaw was a catalyst in the distribution of at least two major cocaine shipments. Indeed, Cashaw undertook an organizational role when he recruited Rashid's assistance in distributing both a 99-kilogram Houston cocaine shipment and

------

[6]The following discussion represents Judge Wollman's separate view on this issue.

-13-

the 76-kilogram Los Angeles cocaine shipment.  Contrary to Cashaw's arguments, a defendant can be held accountable as an organizer or leader under the Guidelines even if he did not directly control others in the conspiracy.  See United States v. Miller, 91 F.3d 1160, 1164 (8th Cir. 1996).  Accordingly, I would hold that the district court did not err in imposing a four-level enhancement.

Jones challenges the district court's refusal to charge the jury with his proposed buyer-seller jury instruction.  Jones cites United States v. Prieskorn, 658 F.2d 631, 633 (8th Cir. 1981), as authority for his argument that a buyer-seller relationship alone does not establish conspiracy.  Be that as it may, Jones was entitled to a buyer-seller instruction only if the evidence supported his theory.  See United States v. Turner, 975 F.2d 490, 497 (8th Cir. 1992).  We conclude that it did not do so in this case in light of the massive amounts of cocaine involved and the inescapable conclusion that Jones was receiving cocaine from Rashid for resale.  See Turner, 975 F.2d at 497; United States v. Hamell, 931 F.2d 466, 470 (8th Cir. 1991).  Furthermore, the evidence shows that Jones played numerous roles in the conspiracy. He acted as a courier for Rashid on his Atlanta route, was a major distributor in Kansas City, and used his auto shop to help disassemble vehicles used in smuggling.  No reasonable juror could have believed that Jones and Rashid were merely involved in a buyer-seller relationship.  See Turner, 975 F.2d at 498.

Jones also contends that he was entitled to a multiple conspiracy instruction. Such an instruction should only be given, however, where there is evidence to support its submission.  See United States v. Lucht, 18 F.3d 541, 552 (8th Cir.), cert. denied, 513 U.S. 949 (1994).  "If the evidence sufficiently supports only a theory of a single conspiracy, a district court does not err by refusing to give multiple conspiracy instructions."  United States v. Maza, 93 F.3d 1390, 1398 (8th Cir. 1996), cert. denied, 117 S. Ct. 1008 (1997).  Because the evidence here established but a single conspiracy to move large quantities of drugs from source cities to numerous distribution points

-14-

throughout the United States, the district court did not err in refusing to submit a multiple conspiracy instruction.

We find to be without merit Jones's argument that the district court erred in admitting certain statements he made to a Federal Bureau of Investigation agent.

Palmer argues that the government failed to establish his participation in the conspiracy. Having viewed the evidence in a light most favorable to the verdict and having accepted all reasonable inferences supporting the conviction, as we are required to do, see, e.g., United States v. Holloway, 128 F.3d 1254, 1257 (8th Cir. 1997), we conclude that Palmer's role as a courier was more than adequately established.[7]

HEANEY, Circuit Judge, concurring in part and writing the majority opinion with respect to Cashaw's enhancement, in which BRIGHT, Circuit Judge, joins.

We join in all but that portion of the court's opinion affirming Cashaw's four-level enhancement under U.S.S.G. § 3B1.1(a). We also write separately to highlight the district court's discretion to grant a downward departure when the government's conduct directly results in prejudice to a defendant which is significant enough to take the case out of the heartland of the Sentencing Guidelines.

"At sentencing, the government bears the burden of proving, by a preponderance of the evidence, facts necessary to establish a defendant's role in the offense." United States v. Rodgers, 122 F.3d 1129, 1133 (8th Cir. 1997) (citations omitted). In

---

[7]All of the defendants argue that the Tenth Circuit's recent decision in United States v. Singleton, 144 F.3d 1343 (10th Cir. 1998), requires the suppression of non-law enforcement witness testimony that was obtained through promises of leniency. That decision has been vacated, however, and will be reheard by the Tenth Circuit en banc. See United States v. Singleton, No. 97-3178 (10th Cir. July 10, 1998) (order granting rehearing en banc and vacating panel opinion).

determining whether to enhance a defendant's sentence under § 3B1.1 of the Sentencing Guidelines, the sentencing court should consider such factors as "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1, comment. (n.4). While our court may broadly construe the definition of leadership or organization, "if the words 'organizer' and 'leader' are to have their ordinary meaning, a defendant must do more than sell [drugs] for resale." United States v. Miller, 91 F.3d 1160, 1164 (8th Cir. 1996) (citing United States v. Rowley, 975 F.2d 1357, 1364 n.7 (8th Cir. 1992) ("[W]e have always required evidence that the defendant directed or procured the aid of underlings.")); see also United States v. Del Toro-Aguilera, 138 F.3d 340, 343 (8th Cir. 1998) (status as supplier or distributor without more is insufficient to support a managerial enhancement under § 3B1.1).

The record in this case does not support the conclusion that Cashaw exercised decision-making authority, recruited accomplices, claimed right to a larger share of the fruits of the crime, participated in the planning or organization of the conspiracy, or had control or authority over others. Nothing in the record indicates that Cashaw did anything other than provide drugs to Rashid. While Cashaw provided significant amounts of drugs to the conspiracy, his status as a supplier or distributor is already reflected in his base-offense level. See Del Toro-Aguilera, 138 F.3d at 343; United States v. Bryson, 110 F.3d 575, 585 (8th Cir. 1997). In this regard, this case is factually indistinguishable from Miller. The record reveals that Cashaw did not undertake an organizational role in Rashid's drug operation, much less the Los Angeles or Houston cocaine shipments. Rather, Cashaw merely sold drugs for resale. At trial, for example, Rashid testified that "Mr. Cashaw was a supplier. He was not part of my operation." (Tr. at 122.) Rashid also testified that he never invited Cashaw to California and that Cashaw did not "have any control over where [Rashid was] going

-16-

with any contraband [Rashid] may have received in California." (Tr. at 144.) With respect to the Houston shipment, the record similarly indicates that Cashaw was either reselling drugs he had himself purchased or embarking on a joint venture to purchase drugs. In sum,

> [Cashaw] was not the "organizer" or "leader" of a conspiracy. Although [he] sold large enough quantities of [cocaine] that it is reasonable to infer that he knew the drugs were being resold, [he] did not have any involvement in the resales. There is no evidence that [Cashaw] controlled his buyers in their resale of the [cocaine].

Miller, 91 F.3d at 1164. Because Cashaw's role in the offense does not satisfy any of the factors enumerated in the commentary to the Sentencing Guidelines and because it was limited to selling drugs for resale, the district court committed clear error by imposing a four-level enhancement under § 3B1.1(a).

Furthermore, we note that this case exemplifies an emerging trend in which the government secures a substantially reduced sentence for the principals of a drug conspiracy in exchange for their testimony against lesser members of the conspiracy. This trend generally results in the principals receiving substantially lower sentences than the lesser members and is yet another example of how the Sentencing Guidelines have transferred the discretion once held by judges to the government. While courts generally endorse this anomalous byproduct of the Sentencing Guidelines, to the extent that the government's behavior directly results in prejudice to a defendant, which is significant enough to take the case out of the heartland of the Sentencing Guidelines, district courts have the discretion to grant an appropriate downward departure.

As the court's opinion correctly notes, the government was less than forthright with the jury about its arrangements with Rashid and Whitley regarding the consequences of their testimony. The district court sentenced Jones and Palmer to 235 months each and Cashaw to 360 months imprisonment. Rashid, far and away the

kingpin of the conspiracy, originally faced a sentence of 360 months to life which was ultimately reduced to 60 months for his cooperation in testifying against the lesser members of the conspiracy. At Cashaw's sentencing, the district court responded to Cashaw's request for a downward departure:

> [T]his simply isn't fair and doesn't make a lot of sense and I agree with that but I unfortunately, or maybe fortunately, cannot be responsible for the actions of other judges in other cases. And the fact that there may be some apparent inconsistencies is something that a court of higher authority than mine is going to have to address.

(Sentencing Tr. at 3.) In addition, the district court stated that "I am personally offended by the differences that the law dictates in these sentences but there is nothing I can do about it." (Sentencing Tr. at 76.)

In promulgating § 3B1.1, the Sentencing Commission included managerial adjustments "primarily because of concerns about relative responsibility." U.S.S.G. § 3B1.1, comment. (backg'd); see also United States v. Rodrigues, 112 F.3d 374, 377 (8th Cir. 1997) ("The adjustment for being an organizer or leader is intended to reflect relative responsibility compared to other participants in the crime."). While the Sentencing Guidelines apportion sentences based at least in part on the relative responsibility of each conspirator in a conspiracy, "dissatisfaction with the available sentencing range or a preference for a different sentence than that authorized by the guidelines is not an appropriate basis for a sentence outside the applicable guideline range." U.S.S.G. § 5K2.0, comment. Thus, a district court does not have the discretion to grant a downward departure if its only objection is the disparity of sentences between co-conspirators. However, where the government's conduct directly results in prejudice to a defendant, which is significant enough to take the case out of the heartland of the guidelines, the district court has the discretion to impose a downward departure. See United States v. Lopez, 106 F.3d 309, 311 (9th Cir. 1997) (Lay, J.) (citing Koon v. United States, 116 S. Ct. 2035, 2046 (1996)).

-18-

Because the district court committed clear error by imposing a four-level managerial enhancement under § 3B1.1(a), Cashaw's sentence is vacated and the case is remanded for resentencing. Also, if the district court on remand determines that any of the appellants were directly prejudiced by the government's conduct significantly enough to take the case out of the heartland of the Sentencing Guidelines, it may exercise its discretion in determining whether to grant an appropriate downward departure.

A true copy.

Attest.

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.