# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-1078

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Western District of Missouri. |
| Michael Gandolfo Albanese, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: June 18, 1999
Filed: October 5, 1999

_____

Before BOWMAN and HEANEY, Circuit Judges, and LONGSTAFF,[1] District Judge.

_____

BOWMAN, Circuit Judge.

Michael Gandolfo Albanese was charged with conspiring to distribute five or more kilograms of cocaine in violation of 21 U.S.C. § 841 (1994). Two prior proceedings having ended in mistrials, Albanese was convicted in a third proceeding and sentenced to 360 months of incarceration. He appeals, claiming that government misconduct caused the second proceeding to end in a mistrial and that the Double Jeopardy Clause therefore barred his subsequent reprosecution. Albanese also

_____

[1]The Honorable Ronald E. Longstaff, Chief Judge, United States District Court for the Southern District of Iowa, sitting by designation.

challenges the District Court's admission of testimony from a witness compensated by the Government.  We affirm.

I.

Albanese was convicted for conspiring with two other men, Nicholas LanFranca and Joseph Riley. In January 1997, Riley arranged to purchase five kilograms of cocaine from Joseph Bartels.  Riley intended to rob and kill Bartels instead of paying for the cocaine.

On January 30, 1997, Riley met Bartels at a motel in Platte County, Missouri. While Albanese and LanFranca waited outside the motel in Riley's car, Riley entered the motel room and shot Bartels, seriously wounding him.  Bartels was a paid cooperating witness for the Federal Bureau of Investigation (FBI), and FBI agents were monitoring the purported drug transaction from an adjoining room.  Agents rushed into the motel room and shot and killed Riley. Other FBI agents then arrested Albanese and LanFranca outside the motel.

Albanese and LanFranca were charged in federal court for their role in the conspiracy, and Albanese was charged in state court for Riley's death.  Because LanFranca was on supervised release at the time of his arrest, the Government also moved to have his release revoked.  Bartels testified at LanFranca's revocation hearing in March 1997 regarding LanFranca's participation in the conspiracy, and the District Court[2] revoked LanFranca's release. LanFranca then pleaded guilty to the federal drug-conspiracy charge and agreed to testify against Albanese.

---

[2]The Honorable Howard F. Sachs, United States District Judge for the Western District of Missouri, presided over the revocation hearing and all other federal proceedings relevant to this appeal.

Albanese's federal criminal trial was scheduled on three separate occasions. The District Court discontinued the first proceeding in December 1997 after voir dire because pretrial publicity regarding Albanese's state murder trial had tainted the venire.[3] Albanese then went to trial a second time in February 1998. This trial reached jury deliberations, but the District Court declared a mistrial after the jury could not reach a unanimous verdict. Finally, Albanese went to trial a third time in March 1998. He was convicted and subsequently sentenced. Seeking reversal of his conviction, Albanese appeals.

## II.

Normally the Double Jeopardy Clause allows a criminal defendant to be retried after a prior proceeding ends in a hung jury. See Richardson v. United States, 468 U.S. 317, 323-24 (1984); United States v. Perez, 22 U.S. (9 Wheat.) 579, 579-80 (1824). In Oregon v. Kennedy, 456 U.S. 667 (1982), however, the Supreme Court recognized an exception to this rule where the Government engages in conduct intended to provoke a criminal defendant to move for a mistrial, and the defendant successfully moves for a mistrial based on this misconduct. See id. at 679. Albanese claims that government misconduct regarding inconsistent testimony by Bartels, a paid government witness, caused the February 1998 trial to end in a mistrial, and therefore Kennedy bars his retrial and conviction.

Bartels gave inconsistent accounts of LanFranca's role in the conspiracy at LanFranca's revocation hearing in March 1997 and at Albanese's conspiracy trial in February 1998. At LanFranca's revocation hearing, Bartels testified that LanFranca participated actively in the conspiracy and knew of Riley's desire to rob and kill a drug dealer. Specifically, Bartels testified that, during a March 1996 conversation regarding

---

[3]Jeopardy did not attach in the first proceeding, because the jury had not yet been sworn. See United States v. Givens, 88 F.3d 608, 611 (8th Cir. 1996).

a proposed drug deal, LanFranca stood two feet away from Riley and Bartels and, although not speaking, appeared to back Riley up when Riley suggested robbing and killing a drug dealer. See Transcript of Proceedings (Partial) dated March 3, 1997, at 8, 14-15. At Albanese's February 1998 trial, however, Bartels minimized LanFranca's participation in the drug conspiracy, testifying that LanFranca was "present, but he was not close to [Bartels and Riley] and he was not involved in that specific conversation" when Riley suggested to Bartels that they should rob and kill a drug dealer. See Transcript of [the February 1998] Proceedings, Cross-Examination of Joseph Bartels at 25. According to Albanese, Bartels' inconsistency helped the Government because Bartels' March 1997 testimony would have contradicted, but the February 1998 testimony supported, LanFranca's February 1998 testimony that Albanese knew Riley wanted to rob and kill a drug dealer, while LanFranca himself was unaware of Riley's plan. Cf. Partial Transcript of [the February 1998] Proceedings, Cross-Examination of Nicholas J. LanFranca at 16-20.

Albanese alleges the Government engaged in misconduct when it failed to disclose the inconsistencies in Bartels' testimony. The same Assistant United States Attorney (AUSA) examined Bartels at LanFranca's March 1997 revocation hearing and during Albanese's February 1998 trial. When Bartels offered testimony in the February 1998 trial that was inconsistent with his previous testimony, however, the AUSA did not tell the District Court or defense counsel[4] about Bartels' previous testimony. Rather, one of the District Court's law clerks who observed both proceedings told the judge that Bartels' February 1998 testimony contradicted his earlier testimony. The District Court then alerted defense counsel, and--after the AUSA provided defense counsel with a transcript of Bartels' testimony at the revocation hearing--permitted defense counsel to reopen his examination of Bartels and reveal the prior inconsistent testimony to the jury.

---

[4]Albanese's appellate counsel did not represent Albanese during the February 1998 or March 1998 proceedings before the District Court.

Bartels' inconsistent testimony having been revealed, the case went to the jury, which failed to reach a unanimous verdict. Albanese's argument, essentially, is that the hung jury and the resulting mistrial were caused by the inconsistencies in Bartels' testimony that were shown to the jury. Albanese further argues that, because government misconduct produced the inconsistent testimony that caused the February 1998 proceeding to end in a mistrial, Kennedy bars Albanese's subsequent reprosecution.

There are at least three major problems with Albanese's argument. First, Albanese relies only on conjecture when he claims that the events surrounding the revelation of Bartels' prior inconsistent testimony caused the hung jury. Albanese claims we should adopt his hypothesis because, he argues, the only explanation as to why the February 1998 jury would not convict Albanese, while the jury in the state murder trial and the March 1998 jury did convict him, was that only the February 1998 jury was privy to the Government's failure to disclose Bartels' prior inconsistent testimony. Many other factors, however, might explain why the February 1998 jury reached a different conclusion. We do not and as a practical matter cannot know why the February 1998 jury failed to reach a unanimous verdict. See United States v. Felix, 996 F.2d 203, 209 (8th Cir. 1993) (stating that there is no way to know why a jury reaches a particular verdict). Therefore, we hesitate to speculate in the way Albanese urges.

Second, the circumstances in which Kennedy bars retrial are unlike the present case. In Kennedy, the Court was concerned that a prosecutor, believing a case was not going well and fearing the jury might acquit the defendant, would engage in misconduct in the hope of provoking the defendant to move for a mistrial. The Court was reluctant to allow the prosecution to put the defendant in the position of having to choose either to refrain from moving for a mistrial, instead hoping any conviction gained by the misconduct would be overturned, or to move for a mistrial, thus giving the prosecutor another opportunity to try the case. See Kennedy, 456 U.S. at 673-76. In this case,

however, Albanese never faced this Hobson's choice: Albanese faced reprosecution only because the jury, for whatever reason, failed to reach a unanimous verdict in the February 1998 trial.

Third, and most importantly, the Government's conduct in this case simply does not rise (or, more accurately, sink) to the level at which <u>Kennedy</u> would bar retrial. Several grounds support this conclusion. First, <u>Kennedy</u> forbids a retrial only if the government intentionally engaged in the conduct that caused the defendant to move for mistrial. <u>See</u> <u>Jacob v. Clarke</u>, 52 F.3d 178, 181 (8th Cir. 1995) (stating that, under <u>Kennedy</u>, a defendant "must prove <u>intentional</u> prosecutorial misconduct"). Albanese does not accuse the Government of intentionally causing Bartels to change his testimony, nor does Albanese offer proof that the Government expected that Bartels would change his testimony. The District Court, in fact, stated it did not believe that the Government engaged in intentional misconduct. <u>See</u> Excerpts of Sentencing Transcript, Appellant's Appendix at 84. This finding is not clearly erroneous.[5]

In addition, Albanese cannot point to any right the Government violated by failing to notify him that Bartels was testifying inconsistently. Bartels gave his prior testimony at a public proceeding, so the Government's failure to turn over a transcript of Bartels' prior testimony violated neither <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963), nor the Jencks Act, 18 U.S.C. § 3500 (1994). <u>See</u> <u>United States v. Jones</u>, 160 F.3d 473, 479 (8th Cir. 1998) (finding no <u>Brady</u> violation where the government failed to

---

[5]The fact that Bartels was paid for cooperating in this and other federal criminal investigations, a point discussed in greater detail <u>infra</u> in Part III, adds little to this analysis. Albanese does not suggest that the Government compensated Bartels so that he would testify inconsistently, or that Bartels' compensation depended upon the content of his testimony or the outcome of the trial. <u>Cf.</u> <u>United States v. Risken</u>, 788 F.2d 1361, 1373-74 (8th Cir.) (affirming a conviction although a prosecution witness was compensated and the amount of compensation varied according to the outcome of the trial), <u>cert. denied</u>, 479 U.S. 923 (1986).

inform defense counsel of a plea agreement "because transcripts of [the] plea agreement and sentencing hearing were readily available"); id. at 479 n.5 (stating that matters of public record are "not within the scope of the Jencks Act"). Moreover, defense counsel had ample opportunity to learn about Bartels' prior testimony. Defense counsel knew about LanFranca's revocation hearing, having requested the testimony of other witnesses at the proceeding,[6] and even deposed Bartels before Bartels testified at Albanese's February 1998 trial.

Moreover, though Albanese correctly points out that a prosecutor may not knowingly, recklessly, or negligently introduce perjured testimony, see United States v. Duke, 50 F.3d 571, 577-78 (8th Cir. 1995), Albanese has not shown that Bartels committed perjury. Bartels' testimony was inconsistent, but these inconsistencies might have been due to the gunshot wound Riley inflicted and its treatment, as Bartels claimed, see Transcript of [the February 1998] Proceedings, Cross-Examination of Joseph Bartels at 50, or merely the passage of time. In either case, Bartels would lack the requisite mens rea for perjury. See United States v. Dunnigan, 507 U.S. 87, 94 (1993) (stating that a witness does not commit perjury if inconsistencies in testimony are not intentional but rather the "result of confusion, mistake, or faulty memory"). Albanese has shown nothing more than that a government witness testified inconsistently. This does not violate Duke.

Finally, whatever problems Bartels' inconsistent testimony caused were effectively cured at trial. Albanese had adequate opportunity to expose the inconsistencies to the jury in both the second and third proceedings. The District Court permitted defense counsel to reopen his examination of Bartels during the February

---

[6]When Albanese's attorney asked an FBI agent to name the witnesses who testified at LanFranca's revocation hearing, the agent apparently failed to mention that Bartels had testified. This omission alone, however, does not prove that the Government acted improperly. Albanese has made no attempt to show that the FBI agent's omission was anything more than inadvertent.

1998 trial, and the Government questioned Bartels regarding his inconsistent testimony during its direct examination of him at the March 1998 trial. Albanese does not suggest that the belated revelation that Bartels was testifying inconsistently impeded his defense during the February 1998 trial. In fact, we agree with the District Court that the manner in which the inconsistency was revealed--allowing Albanese to reopen cross-examination of Bartels on this point--probably highlighted Bartels' inconsistent testimony and if anything aided Albanese's defense. See Excerpts of Sentencing Transcript, Appellant's Appendix at 84.

For these reasons, we hold that Albanese's reprosecution subsequent to the February 1998 mistrial did not violate his rights under the Double Jeopardy Clause.

## III.

We also reject Albanese's argument that the District Court erred when it failed to exclude Bartels' testimony because Bartels received compensation. The Government admits that Bartels received leniency on criminal charges he faced and payments in excess of $60,000 for his cooperation in investigating and prosecuting this conspiracy and other criminal activities. Albanese claims that 18 U.S.C. § 201(c)(2) (1994)[7] forbids such compensation. Albanese makes the argument, briefly accepted by the

---

[7]Section 201(c)(2) states that anyone who,

> directly or indirectly, gives, offers, or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon a trial, hearing, or other proceeding, before any court, any committee of either House or both Houses of Congress, or any agency, commission, or officer authorized by the laws of the United States to hear evidence or take testimony, or for or because of such person's absence therefrom

shall be imprisoned or fined for such conduct. See 18 U.S.C. § 201(c)(2).

Tenth Circuit in <u>Singleton v. United States</u>, 144 F.3d 1343 (10th Cir. 1998), <u>opinion vacated and rehearing granted</u>, 144 F.3d 1361 (10th Cir. July 10, 1999) (en banc), <u>on rehearing</u>, 165 F.3d 1297 (10th Cir.) (en banc), <u>cert. denied</u>, 119 S. Ct. 2371 (1999), that the Government violated § 201(c)(2) and that this violation requires the exclusion of Bartels' testimony.

This Court has consistently rejected the argument that the government violates § 201(c)(2) when it grants a prosecution witness leniency for testifying. <u>See</u> <u>United States v. Johnson</u>, 169 F.3d 1092, 1097-98 (8th Cir. 1999); <u>United States v. Boyd</u>, 168 F.3d 1077, 1078 (8th Cir. 1999). We also have a long history of allowing the government to compensate witnesses for their participation in criminal investigations. <u>See</u>, <u>e.g.</u>, <u>United States v. Einfeldt</u>, 138 F.3d 373, 377 (8th Cir. 1998) (affirming a conviction although defense counsel did not learn the government compensated a prosecution witness until trial); <u>United States v. Gordon</u>, 974 F.2d 97, 99-100 (8th Cir. 1992) (finding the evidence was sufficient to uphold the appellant's conviction, even though the primary prosecution witness had received $77,000 through the witness protection program plus $30,000 as a percentage of the illegal funds that he helped the government recover); <u>United States v. Risken</u>, 788 F.2d 1361, 1373 (8th Cir.) (upholding a conviction obtained through testimony of a paid government witness although the fact that the witness would receive greater compensation if the defendant were convicted was not disclosed to the jury), <u>cert. denied</u>, 479 U.S. 923 (1986); <u>United States v. Quinn</u>, 543 F.2d 640, 651 (8th Cir. 1976) (stating that ordinarily a defendant is entitled to cross-examine a paid informant regarding his or her relationship and agreement with the government, but not suggesting such payments are inappropriate).

Furthermore, just as certain federal statutes indicate prosecutors may--in apparent contradiction to § 201(c)(2)--grant witnesses leniency for testifying, <u>see</u>, <u>e.g.</u> 18 U.S.C. § 3553(e) (1994) (allowing a court, on the government's motion, to impose a sentence below a statutory minimum "to reflect a defendant's substantial assistance

in the investigation or prosecution of another person who has committed an offense"); 28 U.S.C. § 994(n) (1994) (requiring the Sentencing Guideline Commission "to take into account a defendant's substantial assistance in the investigation or prosecution of another person who has committed an offense"); see also Johnson, 169 F.3d at 1098; United States v. Ramsey, 165 F.3d 980, 990 (D.C. Cir. 1999), other statutes authorize the federal government to pay witnesses, see, e.g., 18 U.S.C. § 3521(b) (1994) (allowing the government to provide services, including payments to meet living expenses, to individuals who testify for the federal or state governments in criminal trials).

The fact that the Government granted Bartels leniency and paid him for his assistance was known to the jury and was fully explored at trial before the jury convicted Albanese. We conclude that § 201(c)(2) provides no basis for reversing this conviction.

## IV.

For the reasons stated above, Albanese's conviction is affirmed.

HEANEY, Circuit Judge, dissenting.

Whether the government violates 18 U.S.C. § 201(c)(2) by paying a witness in exchange for testimony is an issue of first impression in this court. I believe the government's payment for a witness's testimony violates § 201(c)(2), and I believe an evidentiary hearing is required for the government to show its payments to Bartels did not constitute such an illegal payment. Because the majority fails to address this issue adequately, I respectfully dissent.

## I.

As the majority recounts, Bartels' testimony at Albanese's February 1998 trial conflicted with his testimony at LanFranca's March 1997 revocation hearing. Subsequently, at the March 1998 trial that resulted in Albanese's conviction, both the prosecutor and the defense broached the subject of Bartels' compensation for his assistance to the government. On direct, the government elicited the following testimony:

Q     Have you been paid in the course of your cooperation?
A     Yes.
Q     How much have you been paid?
A     I roughly believe the total amount would be somewhere in the sixties, mid sixties.
Q     Mid 60,000?
A     60,000.
Q     If I tell you $66,311.36, does that sound about right?
A     Yes, sir.

(Tr. Vol. I at 211-12.)

On cross-examination, Bartels clearly indicated that he was being paid for his trial testimony:

Q     Now you are getting paid for your time here today?
A     Yes, sir.
Q     How much do you charge?
A     I don't charge.
Q     How much do you get paid for being here to testify?
A     I don't know. I don't make that decision.
Q     Do you get paid whether you tell the truth or not?
A     I get paid for my time, my services.

(Tr. Vol. II at 275.)

II.

In Singleton v. United States, 144 F.3d 1343 (10th Cir. 1998) (Singleton I), rev'd, 165 F.3d 1297 (10th Cir.) (en banc), cert. denied, 119 S. Ct. 2371 (1999), a panel of the Tenth Circuit reversed a criminal conviction on the ground that the prosecutor violated § 201(c)(2) by offering a co-defendant leniency in exchange for truthful testimony. In its en banc opinion reversing Singleton I, the Tenth Circuit concluded that the statute's reference to "whoever" did not apply to government prosecutors. The court reasoned that an Assistant United States Attorney acting within the scope of the authority of that office is "the alter ego of the United States exercising its sovereign power of prosecution." See United States v. Singleton, 165 F.3d 1297, 1299-1302 (10th Cir. 1999) (en banc) (Singleton II). We confronted the same issue in United States v. Johnson, 169 F.3d 1092 (8th Cir. 1999), petition for cert. filed (U.S. June 15, 1999) (No. 84-2449). In that case, Johnson argued the district court should have suppressed the testimony of a number of cooperating witnesses because the government's cooperation agreements violated § 201(c)(2). We rejected Johnson's argument, noting the Tenth Circuit's ultimate rejection of the argument. See 169 F.3d at 1097-98. Unlike the Tenth Circuit, however, we did not go so far as to hold that federal prosecutors were beyond the reach of the federal anti-bribery statute: "We agree that the statute does not sweep so broadly as to prevent prosecutors from offering leniency to an individual in exchange for truthful testimony." 169 F.3d at 1098.

In my view, this case is controlled neither by our decision in Johnson nor by the string of cases cited by the majority. This court simply has not yet decided whether the practice of paying witnesses for testimony violates § 201(c)(2). In none of the cases cited by the majority did we decide whether § 201(c)(2) prevents the government from purchasing testimony. Moreover, only in Risken is it clear that the witness in question was compensated specifically for testimony rather than for mere information. Compare United States v. Risken, 788 F.2d 1361, 1372-73 (8th Cir. 1986) (witness received fee contingent upon defendant's conviction) with United States v. Einfeldt, 138 F.3d 373, 377 (8th Cir. 1998) (trial witness was paid informant), United States v. Gordon, 974 F.2d 97, 98-99 (8th Cir. 1992) (witness granted immunity and placed in witness

protection program in exchange for "cooperation"; witness paid 25% of any illegally-obtained money he "helped to recover"), and United States v. Quinn, 543 F.2d 640, 646, 651 (8th Cir. 1976) (paid informant was never called as witness). I therefore believe this court must confront squarely § 201(c)(2)'s impact on the government's payment for testimony.

III.

At the outset, I believe § 201(c)(2) cannot be read to exclude government prosecutors. In Nardone v. United States, the Supreme Court considered whether government agents were covered by a statute that allowed "no person" to engage in wiretapping. 302 U.S. 379 (1937). Looking to long-established canons of statutory construction, the Court concluded that the language of the statute must be taken at face value, thereby including government agents within its prohibition. 302 U.S. at 383-84.

The Court began by acknowledging the rule that "general words of a statute do not include the government or affect its rights unless the construction be clear and indisputable upon the text." Id. at 383. However, the Court determined that the application of the rule excluding the government is limited to two classes of cases. The first is "where an act, if not so limited, would deprive the sovereign of a recognized or established prerogative title or interest." Id. at 383. The second is where reading a statute to include governmental officers "would work obvious absurdity." Id. at 384. The Court concluded the anti-wire-tapping statute at issue fit within neither class. Finally, the Court noted the canon dictating that "the sovereign is embraced by general words of a statute intended to prevent injury and wrong." Id.

As the Singleton II opinion makes clear, the government's practice of offering leniency in exchange for truthful testimony is a prosecution tactic deeply rooted in the common law. See Singleton II, 165 F.3d at 1301 ("This ingrained practice of granting lenience in exchange for testimony has created a vested sovereign prerogative in the

government."); see also United States v. Ware, 161 F.3d 414, 419 (6th Cir. 1998) ("The prosecutorial prerogative to recommend leniency in exchange for testimony dates back to the common law in England and has been recognized and approved by Congress, the courts, and the Sentencing Commission of the United States"). Construing § 201(c)(2) to forbid such bargaining would therefore run afoul of Nardone by infringing upon a "recognized or established prerogative" of the government.

But construction of the statute to permit the government to offer pecuniary rewards for testimony--as Albanese claims the government did in this case--is another matter entirely.[8] First, although the practice of paying for *information* is certainly familiar, I find no indication that payments specifically for *testimony* have a similar pedigree. To the contrary, the corrupting influence of money on testimony and the judicial process as a whole has long been a concern at common law, as amply illustrated by the Singleton II dissenters. See Singleton II, 165 F.3d at 1313-14 (Kelly, J., dissenting) (noting that at common law in most jurisdictions it is improper to pay occurrence witness any fee for testimony, and that agreements to pay fact witnesses are generally void as contrary to public policy and for lack of consideration). And while it is true that we have upheld contingent-fee agreements for witness testimony such as that in Risken against due process challenges, such agreements can hardly be deemed established to the point of being a sovereign prerogative. See Samuel A. Perroni &

---

[8]While the rejection of Singleton I may aptly be characterized as a "stampede," United States v. Lowery, 166 F.3d 1119, 1123 (11th Cir. 1999), other courts have recognized that the issue we face in this case is distinct from that in Singleton, see United States v. Hunte, No. 97-1987, 1999 WL 649627, at *4 n.4 (3d Cir. Aug. 26, 1999) (reserving question of § 201(c)(2)'s application where witness has received money from government in exchange for testimony); United States v. Condon, 170 F.3d 687, 689 (7th Cir. 1999) (rejecting argument that leniency in exchange for testimony violates § 201(c)(3), but declining to hold that statute does not apply to federal prosecutors; "[t]hat approach, if taken seriously, would permit prosecutors to pay cash for favorable testimony, a practice that lacks the statutory and historical support of immunity and sentence reduction").

Mona J. McNutt, Criminal Contingency Fee Agreements: How Fair Are They?, 16 U. Ark. Little Rock L.J. 211, 214-20 (1994) (recounting how "barrage" of cases involving witness contingent-fee agreements emerged in 1980s).

The majority cites 18 U.S.C. § 3521 as a lone example of "other statutes" that authorize payment of witnesses in apparent contradiction to § 201(c)(2). I see no such contradiction. Under § 3521(a)(1) the government may provide for the relocation and protection of a government witness or potential witness threatened by violence or other interference. The government may provide for the relocation and protection of such witnesses, including payment of living expenses, where necessary to protect the witness and assure that person's health safety and welfare. See 18 U.S.C. § 3521(b)(1). But the plain purpose of this statute is protection, not compensation; payments and other gratuities are provided "in connection with the protection . . . of a witness," and must be determined by the Attorney General to be "necessary to protect the person involved from bodily injury and otherwise to assure the health, safety, and welfare of that person." Id.

I think it also clear that no absurdity results from holding both the government as well as private entities bound by a statute intended to protect the reliability of testimony. To the contrary, I find no reason to believe that testimony bought and paid for by the government is somehow immune from being corrupted, either by design or otherwise. Finally, Nardone counsels that a statute "intended to prevent injury and wrong," as § 201(c)(2) plainly is, applies to the sovereign as well. See Nardone, 302 U.S. at 384.

IV.

I believe that here, as with the government's violation of the anti-wire-tapping statute in Nardone, the appropriate remedy is the exclusion of evidence obtained by the

-15-

government in violation of the statute. See Nardone v. United States, 308 U.S. 338, 339-41 (1939).

"Any claim for the exclusion of evidence logically relevant in criminal prosecutions is heavily handicapped. It must be justified by an over-riding public policy expressed in the Constitution or the law of the land." Id. at 340. We must reconcile the need for "stern enforcement of the criminal law" with the concern for preservation of the integrity of the judicial process that Congress has manifested in § 201(c)(2). See id. The circumstances of the case before us persuade me that this balance should tip toward protection of the trustworthiness of the judgments of our courts. As in the Fourth Amendment context, exclusion of paid testimony would provide a vital incentive for the government to abide by the law. Moreover, exclusion of paid testimony directly advances the concern of the underlying law: the reliability of evidence.

The case before us illustrates vividly the dangers posed by the government's purchase of testimony. With respect to LanFranca, Bartels appears to have attempted to give the testimony he thought the government wanted to hear, implicating LanFranca in the conspiracy at LanFranca's revocation hearing, and then changing his testimony so as to shore up LanFranca's credibility at Albanese's February 1998 trial, where LanFranca testified for the government. It is only by the aid of the district judge's perceptive law clerk that we are aware of this particular prevarication; one can only wonder in what other ways Bartels endeavored to keep his customer satisfied.

This case should be remanded to the district court for an evidentiary hearing. Because the relevant information on this issue is in the possession of the government, once a defendant has made a prima facie showing that the government is paying a witness or providing other tangible remuneration for or because of testimony, the burden must shift to the government to prove that it has not violated § 201(c)(3). On remand, the government should be allowed to present additional evidence on this issue,

-16-

although the present state of the record strongly suggests to me that the government will be unable to carry this burden.

V.

For the foregoing reasons, I respectfully dissent.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.